## AMERICAN TOBACCO CO. v. FEDERAL TRADE COMMISSION.*

(Circuit Court of Appeals, Second Circuit. October 20, 1925.)

No. 36.

1. **Trade-marks and trade-names and unfair competition ⬤⟹80½, New, vol. 8A Key-No. Series—What constitutes unfair competition is for court, and not for Federal Trade Commission.**

Under Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), ultimate determination of what constitutes unfair competition is for court, and not for commission.

2. **Trade-marks and trade-names and unfair competition ⬤⟹80½, New, vol. 8A Key-No. Series—Dissolution of voluntary unincorporated association held not to deprive Federal Trade Commission of jurisdiction.**

Where Federal Trade Commission filed complaint, under Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), against voluntary unincorporated wholesale dealers' association and its officers, directors, and members individually, charging unfair methods of competition, held, that subsequent dissolution of association did not deprive commission of jurisdiction on ground question became moot.

3. **Trade-marks and trade-names and unfair competition ⬤⟹80½, New, vol. 8A Key-No. Series—Federal Trade Commission's complaint must show unfair competition.**

Federal Trade Commission's complaint under Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), charging unfair competition.

*Certiorari granted 46 S. Ct. 349, 70 L. Ed. ——.

forms basis for proceedings, and facts alleged therein must show unfair competition.

**4. Monopolies ☞17(2)—Tobacco manufacturer may refuse to sell to wholesalers, who sell to retailers at price below that fixed by local wholesalers' association.**

Tobacco manufacturer's refusal to sell to wholesalers, who sold to retailers at price lower than price fixed by local wholesalers' association, to enable them to continue in business at profit *held* not unfair, unreasonable, or contrary to public policy, under Federal Trade Commission Act (Comp. St. §§ 8836a–8836k).

**5. Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Objection that Federal Trade Commission's complaint is insufficient may be taken in first instance in Circuit Court of Appeals on application to set aside commission's order.**

Objection that Federal Trade Commission's complaint, under Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), is insufficient, may be taken in first instance in Circuit Court of Appeals on application to set aside commission's order based thereon.

**6. Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Federal Trade Commission held without jurisdiction to determine whether certain acts constituted restraint of interstate commerce.**

In proceedings to prevent unfair competition, under Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), Federal Trade Commission was without jurisdiction to hear and determine whether certain acts constituted restraint of interstate commerce under Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), notwithstanding Federal Trade Commission Act, §§ 6–10.

**7. Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Federal Trade Commission is not a court, and exercises only administrative power within statute.**

Federal Trade Commission is not a court, and exercises only administrative power within statute.

**8. Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Evidence held insufficient to show conspiracy between tobacco manufacturer and wholesalers.**

Evidence *held* insufficient to show conspiracy between tobacco manufacturer and wholesalers to engage in unfair competition, within Federal Trade Commission Act (Comp. St. §§ 8836a–8836k).

Petition to Review Order of the Federal Trade Commission.

Petition by the American Tobacco Company against the Federal Trade Commission, to review an order of the Commission requiring petitioner to cease and desist from certain practices found by the commission to be unfair methods of competition in interstate commerce. Order of the Federal Trade Commission set aside, in so far as it affects petitioner.

See, also, 283 F. 999.

John Walsh, of Washington, D. C., and Junius Parker and Jonathan H. Holmes, both of New York City, for petitioner.

W. H. Fuller, Chief Counsel, of Washington, D. C., and Edward L. Smith, of Phillipsburg, N. J., for respondent.

Before ROGERS, MANTON, and HAND, Circuit Judges.

ROGERS, Circuit Judge. The Federal Trade Commission on May 29, 1922, served upon the American Tobacco Company, petitioner herein, and certain other corporations, partnerships, and individuals, a complaint charging them with unfair methods of competition in interstate commerce in violation of section 5 of the Act of Congress of September 26, 1914, 38 Stat. 717, c. 311 (Comp. St. § 8836e).

The complaint upon which the Federal Trade Commission proceeded, and upon which it entered the order herein involved, was brought against the Wholesale Tobacco & Cigar Dealers' Association of Philadelphia, its officers, directors, and members. The American Tobacco Company and the Lorillard Company were also made parties. These two companies are New Jersey corporations, each having its principal place of business in Jersey City, and each is engaged in the manufacture of cigars, cigarettes, and other tobacco products, and in the sale thereof to wholesale and retail dealers throughout the United States. It is not alleged in the complaint that either of these corporations ever were members of the Wholesale Tobacco & Cigar Dealers' Association, or were in any manner instrumental in organizing it. The essential allegations of the complaint are found in the margin.[1]

---

[1] Paragraph Two. At the time of the organization of the association, the prices at which said manufacturers sold their products were fixed as follows: Said manufacturers severally supplied the members with a schedule of prices, denominated "list prices," which were the prices severally suggested by said manufacturers at which their products should be resold by members to the retail trade. The prices at which said products were sold to the members were fixed by certain uniform discounts off said list in each instance, whereby the members paid to said manufacturers for said products said list prices minus said discounts. Wholesale

The various defendants, including the American Tobacco, Company, put in separate answers to the complaint. The American Tobacco Company, in its answer, admitted certain mere formal· allegations of the complaint, and declared as to certain others that it had no knowledge or information and could neither admit or deny them, and demanded strict proof thereof, "if they be material," and it concluded by declaring that, "except as to those matters herein specifically admitted, and those matters of which it has no knowledge or information as herein alleged, it denies each and every allegation of the complaint."

The commission took a large amount of testimony, the record containing 1,400 printed pages. Having taken time to consider,

and retail dealers in tobacco products throughout the United States, including respondent dealers set out in groups I, II, and III above, then were and still are dependent upon respondent manufacturers for their supply of a large portion of the products in which they deal. The extent of this dependence is such that, when any such dealer is unable to secure the products or respondent manufacturers or either of them, his business is substantially crippled, and he is placed at a competitive disadvantage with dealers supplied with said products. In the year 1920 the association and its members, acting through the association, and co-operating and conspiring with it and with each other, agreed upon a schedule of fixed prices at which the members should thereafter resell to their dealer customers the products dealt in by the members, including the products of respondent manufacturers, and, having thus fixed said uniform resale prices, adopted a system for the maintenance and enforcement of said resale prices by the members and by all other wholesale dealers in the trade who did business within the territory served by the members. Respondent manufacturers co-operated and conspired with the association, and its members and participated in said price maintenance· system, as is more particularly hereinafter set out. In the course of aforesaid co-operative enforcement of said system, the members and the association, through its officers and directors, did amongst others, and still do, the following acts and things:

(a) Undertook among themselves to maintain said resale prices, and did maintain same.

(b) Caused the fixation of said resale prices to appear as the formal action of the association by an appropriate resolution in that behalf.

(c) Caused the association to notify all members of said action.

(d) Sought by persuasion and intimidation to cause all dealers in the territory above referred to, including those members of the association who discontinued the maintenance of said resale prices in violation of their aforesaid undertakings so to do, to maintain said resale prices.

(e) Sought and secured the co-operation of respondent manufacturers in such persuasion and intimidation, which each said manufacturer rendered by notifying the trade in aforesaid territory, by circular letters and otherwise, that the notifier would refuse to furnish further supplies of his products to any wholesale dealer who failed to resell such products at the prices fixed in aforesaid schedule, or implying the same in veiled language.

(f) Caused reports of the names of said dealers who failed to maintain said resale prices to be reported by the members and their salesmen, either directly to the association, or through the respective members in each instance to the association, and, upon receiving such reports, in turn reported the names of such offending dealers to respondent manufacturers, requesting the assistance and co-operation of respondent manufacturers in the enforcement of said system by having said manufacturers refuse to further supply said offending dealers with any of their products.

(g) As a result of reporting said names to the respondent manufacturers and requesting their co-operation, as set out in specification (f) hereof, secured the co-operation and assistance of said manufacturers in that behalf, and each said manufacturer upon receiving such information proceeded to investigate said instances of price cutting, and upon finding that the offending dealer was cutting prices, and refusing and failing to maintain aforesaid resale prices, refused to furnish said offending dealer with further supplies of its (the manufacturer's) products until the offender gave such promises and assurances of maintaining said resale prices in the future as were satisfactory to said manufacturers and the association in that regard.

(h) Employed special agents to spy upon the members and other dealers in the aforesaid territory, in order to ascertain if any of them were or was failing to maintain said resale prices, and, upon discovering that a member or a dealer was so doing, to report the name of such offender to the association. Upon receiving such reports, sought and secured the co-operation of the manufacturers with regard to said offenders in like manner and with like results as set out in specifications (f) and (g).

Paragraph Three. The aforesaid acts and things done by respondents and each of them had and still have the tendency and capacity to constrain all wholesale dealers doing business in the territory above mentioned to uniformly sell the aforesaid products to their dealer customers at the prices fixed by the association and its members as hereinbefore set out, and hence to hinder and suppress all competition in the wholesaling of said products in said territory, particularly among the members of the association, and further to hinder and restrict competition between all retail dealers in said territory. Respondents' said practices thus tended and still tend to unduly hinder· and obstruct the free and natural flow of commerce. in the channels of interstate commerce.

Paragraph Four. The above acts and things done by respondents and by each of them constitute unfair methods of competition in commerce, within the intent and meaning of section 5 of an act of Congress entitled "An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," approved September 26, 1914.

it made its findings of fact. The findings which relate to the American Tobacco Company are stated in the margin.[2]

An examination of the findings shows that it was found:

(1) That the American Tobacco Company supplied to each of the members of the Wholesale Tobacco & Cigar Dealers' Association of Philadelphia a list of the prices which it (the Tobacco Company) "suggested" as the prices at which its products should be resold by the members of the association to other wholesalers and to the retail trade.

(2) That the association adopted a schedule of fixed prices at which its members should thereafter resell to their dealer customers the tobacco products which they dealt in including the products of the American Tobacco Company, and it adopted a system for the maintenance and enforcement of the said resale prices.

(3) That the association sought by persuasion and intimidation to cause all dealers to maintain the said resale prices.

(4) That the association secured the co-operation of the American Tobacco Company

---

[2] Paragraph Two. During the period of the existence of the association the prices at which the respondent American Tobacco Company sold its products were fixed as follows: It supplied each of the members with a schedule of prices, denominated list prices, which were the prices suggested by said American Tobacco Company at which its products should be resold by the members to other wholesalers and to the retail trade. The prices at which such products were sold to the members were fixed by certain uniform discounts off said list in each instance, whereby the members paid the manufacturers for said products said list prices minus said discounts. Wholesale and retail dealers in tobacco products throughout the United States, including the members, were during the existence of the association, and still are, dependent upon the American Tobacco Company for their supply of the American Tobacco Company's products, which constitute a large portion of the tobacco products dealt in by such wholesale and retail dealers. The extent of this dependence is such that, when any dealer is unable to secure the products of the American Tobacco Company, his business is substantially crippled, and he is placed at a competitive disadvantage with dealers supplied with said products.

On September 16, 1920, the association and its members, acting through the association and co-operating with it and with each other, agreed upon a schedule of fixed prices at which the members should thereafter resell to their dealer customers the tobacco products dealt in by the members, including the products of the American Tobacco Company, and, having thus fixed such uniform resale prices, adopted a system for the maintenance and enforcement of said resale prices by the members and by all of the wholesale dealers in the trade who did business in the territory served by the members. In the course of said co-operative enforcement of said system, the members and the association, through its officers and directors, did among other things, during the period from September 16, 1920, until the end of 1921, the following acts and things:

(a) Undertook among themselves to maintain said resale prices and did maintain same.

(b) Caused the fixation of said resale prices to appear as the formal action of the association by an appropriate resolution in that behalf.

(c) Caused the association to notify all members of said acts.

(d) Sought by persuasion and intimidation to cause all dealers who sold in the general selling territory of the members, including those members who discontinued the maintenance of said resale prices in violation of their aforesaid undertaking so to do, to maintain said resale prices.

(e) Sought and secured the co-operation of the American Tobacco Company in such persuasion and intimidation, which said American Tobacco Company rendered by notifying its trade in the territory of the members, by circular letters and otherwise, that the notifier would refuse to furnish further supplies of its products to any wholesale dealer who failed to resell such products at the prices fixed in the aforesaid letter, or implying the same in veiled language.

(f) Caused reports of the names of said dealers who failed to maintain said resale prices to be reported by the members and their salesmen, either directly to the association or through the respective members in each instance to the association, and, upon receiving such reports, in turn reported the names of such offending dealers to the American Tobacco Company, requesting its assistance in the enforcement of said system by having said American Tobacco Company refuse to further supply said offending dealers with any of its products.

(g) As a result of reporting said names to the American Tobacco Company and requesting its co-operation as set out in specification (f) hereof, secured the co-operation and assistance of the American Tobacco Company in that behalf, and said American Tobacco Company, upon receiving such information, proceeded to investigate said instances of price cutting and, upon finding that the offending dealer was cutting prices and refusing and failing to maintain the said resale prices, refused to furnish said offending dealer with further supplies of its products.

(h) Employed a special agent to spy upon the members and other dealers in the aforesaid territory in order to ascertain if any of them were failing to maintain said resale prices, and, upon discovering that a member or dealer was so doing, to report the name of such offender to the association, which, upon receiving such reports, sought and secured the co-operation of the American Tobacco Company with regard to such offenders in like manner and with like results as set out in specifications (f) and (g).

Paragraph Three. During the period aforesaid, in which the association adopted and main-

in. such persuasion and intimidation. It then proceeds to state what the Tobacco Company did:

(a) It notified its trade by circular letters and otherwise that it would refuse to sell its products to any wholesale dealer who failed to resell at prices fixed in the letter.

(b) When it was informed by the association that dealers in its products were failing to maintain resale prices, the Tobacco Company proceeded. to investigate the matter, and, if it found a dealer was failing to maintain prices, it refused to furnish him with its products.

The conclusion which the Commission reached was that the practices of the respondents described in the findings constituted unfair methods of competition in interstate commerce and violated the act of Congress which created the Federal Trade Commission and which defined its powers and duties. Comp. St. §§ 8836a–8836k.

The order which was entered, in so far as it relates to the American Tobacco Company, and it is the sole party complaining of the order, reads as follows:

"And it is further ordered that the American Tobacco Company cease and desist from assisting and from agreeing to assist any, of its dealer customers in maintaining and en-

tained uniform resale prices for said American Tobacco Company's products in the manner and by the means set out in paragraph two hereof, it was the general policy of said American Tobacco Company to assist groups of its jobbers who would fix, or who had fixed by co-operation among themselves, uniform resale prices on its products, by refusing shipments of its goods to such of its jobbers who had resold or who would resell at prices lower than those fixed by such jobbers by co-operation among one another. Such was the policy of said American Tobacco Company with respect to respondent association and its members. The representatives of said American Tobacco Company in the territory in which the members resold its products were instructed by their superiors to carry out such policy in Philadelphia and vicinity, and because of such instructions such representatives carried out such policy.

Said American Tobacco Company knew of the price agreements made by the association and its members as described in paragraph two hereof, and agreed with the said association and its members to help them maintain the price agreements described in paragraph two hereof.

Charles Seider, one of said American Tobacco Company's distributors in Philadelphia and a competitor of the members, having declined an invitation of the president and treasurer of the respondent association to join its membership, was urged by the division . manager of the American Tobacco Company in charge of its Philadelphia territory to join the association. Said division manager requested said Seider to join the association and not to sell at prices below those fixed by it and its members, but to comply with the uniform prices put into effect by the members and by the association as described in paragraph two hereof. Said Seider refused to join the association, or to abide by its prices, and the said American Tobacco Company, after investigating a complaint made to it by the association and its members that the said Seider was reselling·its products at prices less than those fixed by the association and its members, discontinued selling to said Seider in the period from April 20, 1921, to August 13, 1921, for the purpose of assisting the association and its members to maintain the price agreements as described in paragraph two hereof. After said Seider, following the suggestion made to him by the said division manager that, if he joined respondent association, it would help him get the shipments that had been withheld from him by said American Tobacco Company, applied to the vice president of the respondent association for membership therein, the said American Tobacco Company, reinstated him as one of its customers and forwarded to him shipments that had been withheld in the period from April 20, 1921, to August 13, 1921.

Respondents John Murphy and James Murphy, partners doing business under the name and style Murphy Bros., were expelled from the association in April, 1921, because they were accused by said association of reselling at prices less than those fixed by the association. The American Tobacco Company, after investigating complaints made to it by the association that said Murphy Bros. were reselling its products at prices less than those fixed by the association and its members, discontinued selling said Murphy Bros. in the period from August 29, 1921, to October 4, 1921, for the purpose of assisting the association and its members in maintaining the prices which had been fixed as set out in paragraph two hereof.

For the purpose of assisting the association and its members in maintaining the prices fixed by them as set out in paragraph two hereof, the American Tobacco Company in 1921, because of complaints made to it by the association and its members that respondents Fermani and Blumenthal were reselling its products at prices less than those fixed by the association and its members, withheld shipments of its products to said Fermani and Blumenthal while it was investigating the prices at which Fermani and Blumenthal were reselling its prod-. ucts.

Paragraph Four. The aforesaid acts and things done by said respondents and each of them had the tendency and capacity to constrain all wholesale dealers doing business in the territory above mentioned to uniformly sell the aforesaid products to their dealer customers at the prices fixed by the association and its members as hereinbefore set out, and hence to hinder and suppress all competition in the wholesaling of said products in said territory, particularly among the members of the association, and further to hinder and restrict competition between all retail dealers in said territory. Said respondents' practices thus tended to unduly hinder and obstruct the free and natural flow of commerce in the channels of interstate commerce.

forcing, in the resale of cigarettes and other tobacco products manufactured by the said American Tobacco Company, resale prices for such cigarettes and other tobacco products fixed by any such dealer customer by agreement, understanding, or combination with any other dealer customer of said the American Tobacco Company."

The American Tobacco Company insists that this order should be set aside on two grounds: (1) On the ground that it has never done what it is ordered to "cease and desist" from doing, and which it has no purpose and no desire to do. (2) For the reason that a manufacturer may under the law and with entire propriety, by its conduct, advice, and perhaps in other ways, "assist" its dealer customers in maintaining a resale price on the products manufactured by it.

Section 5 of the Federal Trade Commission Act, having declared "unfair methods of competition in commerce" to be unlawful, empowered the Commission to prevent the use of such methods of competition, if after complaint served and a hearing it determined that such methods were being employed. In that event it authorized the Commission to enter an order to "cease and desist" from such unlawful methods of competition. The act further provides that the Commission may apply to the Circuit Court of Appeals to enforce the order to "cease and desist." It also gives to any party required by such an order to "cease and desist" the right to apply to the Circuit Court of Appeals to review the order. Upon such application, either by the Commission or by a party affected by the order, the court is given jurisdiction to affirm, set aside, or modify the order. In pursuance of the provisions of the act the American Tobacco Company has petitioned this court to set aside the order entered by the Commission on February 16, 1924, which requires it and other persons named therein to cease and desist from certain practices which the Commission has adjudged to be unfair methods of competition.

The act, in section 5, gives to the Commission authority to proceed in unfair competition cases only "If it shall appear to the Commission that a proceeding by it in respect thereof would be" of interest to the public. There does not appear in the record any "finding" that this proceeding is one "of interest to the public." The complaint, however, begins by stating that, "acting in the public interest pursuant to the provisions" of the act of Congress, the Federal Trade Commission charges that the parties named are using unfair methods of competition in interstate commerce in violation of the statute. We should suppose that, when the hearings were concluded and the Commission stated its findings, it would expressly declare whether or not it found the proceeding had been justified as being in the public interest. Proper v. John Bene & Sons, Inc. (D. C.) 295 F. 729; L. B. Silver v. Federal Trade Commission (C. C. A.) 289 F. 985.

In the present proceeding it is not claimed that the ultimate consumer has been prejudiced. It is nowhere asserted that the price to the ultimate consumer, the purchasing public, has been raised or in any degree affected by the acts complained of, and the controversy seems to be one between the jobbers and the amount of the discount they should allow the retailers. In view of the conclusion we have reached on the merits, it is not important to consider whether the Federal Trade Commission has jurisdiction of such a controversy as is here involved, and we express no opinion concerning it.

[1] The Federal Trade Commission is made by the act which creates it the fact-finding body. Its language is that "the findings of the Commission as to the facts, if supported by testimony, shall be conclusive." But the ultimate determination of what constitutes unfair competition is for the court and not for the Commission to decide. Federal Trade Commission v. Gratz, 253 U. S. 421, 427, 40 S. Ct. 572, 64 L. Ed. 993; Federal Trade Commission v. Curtis Publishing Co., 260 U. S. 568, 43 S. Ct. 210, 67 L. Ed. 408.

[2] The complaint was against the Wholesale Tobacco & Cigar Dealers' Association of Philadelphia, its officers, directors, and members. The officers, directors, and members of the association were also named individually in the complaint, and the order to cease and desist named in like manner, not only the association, its officers, directors, and members, but each of them individually by name, and required them all to desist from fixing, enforcing, and maintaining, and from enforcing and maintaining, by combination, agreement, or understanding among themselves, or with or among any of them, or with any other wholesaler of cigarettes or other tobacco products, resale prices for cigarettes or other tobacco products dealt in by such respondents, or any of them, or by any other wholesaler of cigarettes or other tobacco products.

But before the hearing began, although after the complaint was served, the associa-

tion itself dissolved. This it did nearly two years before the order to desist was entered. The findings of fact made by the Commission state that the association existed until at least June 9, 1922. But the fact that it then ceased to exist, and that fact was known to the Commission, does not appear to have been regarded by any of the counsel who took part in the proceedings before the Commission, or by the Commission itself, as any reason for dismissing the complaint and terminating the proceedings; and Commissioner Van Fleet, who alone dissented from the action of the Commission, never suggested as a ground for dissent the fact that the association itself had already ceased to function and was already formally dissolved.

The American Tobacco Company, which alone brought these proceedings into this court, does not now argue that, because of the dissolution of the association, the Federal Trade Commission became powerless to enter the order appealed from. On the contrary, its counsel on the argument in this court asserted that the case is not a moot one, and is not one involving only an academic question. The findings of fact state that the association was "a voluntary unincorporated" body. It was therefore merely a body of persons acting together without a charter for the accomplishment of a common purpose. Such a body was not a legal entity having a distinct existence independent of its members. It had no power as such to contract, and no power to take, hold or dispose of property. Everything that the members of the association did when they met together as an association they could do as well after the association was dissolved, by simply meeting together and passing resolutions expressing the judgment of the meeting as to the policy which the tobacco jobbers in Philadelphia ought to pursue, and the maximum discount they ought to allow to the retailers, and pledging themselves to abide thereby until a similar meeting, subsequently called, should modify the agreement arrived at. The material fact is, not what these jobbers called themselves when they met together and took such action, or whether they called themselves anything. The name they assumed signified nothing, as they did not create a legal entity. They did not bind an entity, but they did bind themselves, and they were individually responsible for what they did. The association as such was responsible for nothing, and we are not impressed by the suggestion that the Federal Trade Commission lost jurisdiction

of the matter involved, and was without power to hear and determine the issue presented, or to enter the order to cease and desist simply because the individuals complained of had ceased to function under the particular name of Wholesale Tobacco & Cigar Dealers' Association of Philadelphia.

[3] It is undoubtedly true that the complaint made by the Federal Trade Commission is the basis for the proceedings, and that the facts alleged therein, if sustained by the findings of the Commission and supported by the evidence, must show unfair competition. Federal Trade Commission v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993.

[4] The order to cease and desist in terms applies to all the respondents, except the Lorillard Company; but the only one affected by the order who is in this court complaining of it is the American Tobacco Company. What that company is ordered to cease and desist is "from assisting and from agreeing to assist" any of its dealer customers in maintaining and enforcing in the resale of its tobacco products resale prices for such products, *"fixed by any such dealer customer by agreement, understanding, or combination with any other dealer customer of said the American Tobacco Company."*

If this order had simply directed the American Tobacco Company to desist from assisting the Wholesale Tobacco & Cigar Dealers' Association of Philadelphia to maintain resale prices, it might perhaps be objected that the question raised by the petition to revise had become moot or academic. But, in view of the form in which the order was entered, any such contention seems frivolous, and the petition raises a real question upon which the petitioner is entitled to have the determination of this court.

It appears that what the American Tobacco Company did was not to enter into any price fixing agreement with any other manufacturers as to the price of its products to the wholesalers or to the retailers or to the public. It simply would not sell to any wholesaler or jobber in the Philadelphia territory, if it found that he was selling to the retailers at a price less than that fixed by the Wholesale Tobacco & Cigar Dealers' Association of Philadelphia. As we understand the record, the American Tobacco Company fixed the price at which it sold its products to the wholesalers and the jobbers, and did not do anything more than refuse to sell its products to any wholesaler or jobber who sold to the retail trade at a price which the Wholesalers' Association fixed as the price

to be charged the retailers, in order that their business as wholesalers might be carried on at a profit which would enable them to continue in business. We have read this record carefully, and are constrained to hold that, in pursuing the course the American Tobacco Company adopted, we fail to discover anything "unfair," or "unreasonable," or in any way contrary to public policy.

[5] The complaint is the basis for the subsequent proceedings. If, when it is properly construed, it is clearly insufficient to show unfair competition, any order founded upon it must be set aside by the court; and the objection that the complaint is insufficient, although not raised before the Commission, may be taken nevertheless in the court on application to set the order aside. Federal Trade Commission v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993.

The object of the Wholesale Tobacco & Cigar Dealers' Association of Philadelphia, as stated in its constitution, was, in part, "to promote uniformity in the customs and usages of the wholesale tobacco and cigar trade; * * * to correct any abuses as may exist in the conduct of the trade by its various members." The by-laws of the association provided for the board of directors, and gave the board "power to appoint committees to carry into effect any objects of the association." The by-laws also provided that the board should appoint an executive committee, to consist of five members, which "shall be vested with powers to determine questions of moment, without reference to the general board, except such vital questions, which in their opinion should be referred to the board."

The president of the American Tobacco Company was asked the following question: "Did you, as directing the policy of the American Tobacco Company, ever consciously invite or co-operate in, in the making or carrying out of, any agreements among jobbers or retailers that would limit their right to sell your products for what they pleased?" He was permitted, over objection, to answer, "I never have."

The vice president of the company, who had charge of its sales department, was asked, "Did the American Tobacco Company insist upon the maintenance of a price in Philadelphia, which according to the information which you got from jobbers was prevailing in Philadelphia?" His answer was, "No, sir; we insisted on nothing." He was also asked: "Q. Did you ever take a jobber off a list because he sold for a lower price in a given community?" He answered: "Ask me a specific instance, and I can answer. We never took, to my knowledge, a jobber off our list exclusively because he sold at a lower price. Q. Although that may have been one of the reasons? A. That may have been a contributing reason."

He was asked: "Q. Did you ever adopt any system of carton marking, reports from jobbers, systematized reports from salesmen, or otherwise, to detect price cutters?" His answer was, "No, sir." He was also asked: "Q. Nor did you ever have a system of reports from jobbers, or jobbers' associations, or systematized reports from salesmen, with respect to it?" He answered: "Not to my knowledge."

He did, however, state the policy of the American Tobacco Company was to cease selling any customer when it thought he was injuring its business. He apparently was in agreement with the statement of the president of the company that the tobacco business is benefited by the merchandising to the consumer at the lowest possible price, "because we sell more goods." He added, "Our business only begins to be endangered when either the retail dealer or the jobber does not make a living wage."

He was asked: "Now, do you feel that if, by reason of the particular jobber selling at less than the living profit in a given community, your other jobbers in that community will become disinterested in your brands, do you feel that that would endanger your business?" His reply was: "It not only would, but on occasions it has. It has gone so far that sometimes jobbers have ceased handling legitimate—good wholesale houses have ceased to handle tobacco and tobacco products. Q. And that, of course, is a thing that you do not relish? A. We don't like that. Q. And you attempt to avoid that wherever it is possible to avoid it? A. And we attempt to avoid it."

The vice president of the Lorillard Company, one of the respondents in this original proceeding, who was in charge of the selling end of his company's business, was asked the following question: "So far as you are aware and have any knowledge or information, did the Lorillard Company, or any of its officials, representatives, or agents, have any part in the formation of any of these various tobacco associations?" His answer was: "No, sir; not as far as I know." As against the Lorillard Company no findings of fact were made

by the Commission, and the proceeding was dismissed as against it.

It appears that one of the jobbers who handled the products of the American Tobacco Company at Minneapolis suggested to that company that it get all the manufacturers together and agree upon some selling policy. He was informed by the vice president of that company, who was in charge of sales, as follows: "We have given consideration to your letter of April 6th, and have not felt that it is at all possible to get co-operation as a unit from the leading tobacco manufacturers. As far as this company is concerned, as Mr. Hill wrote you, we are greatly interested in the matter and regret to see the tendency toward price cutting. We feel very definitely here that, when jobbers have co-operated and have held such conferences as Mr. Hill has suggested, then the manufacturer can step in, by refusing shipments or withholding orders from the demoralizers, and thereby assist those legitimate jobbers who desire to make a profit. Where, however, a condition of general demoralization exists, we feel here that there is little we can do."

In June, 1921, the American Tobacco Company addressed to its "jobbing customers" Circular 2783 which read as follows:

"It is of the highest interest to this company to maintain permanent means of distributing its brands of tobaccos and cigarettes by efficient and business-like methods.

"We can only expect to obtain and hold customers when it is possible for jobbers to sell our products profitably.

"It is obvious that a jobber of our products, who sells at prices which would not permit of the tobacco business itself being profitable, or the business on our brands being profitable, taken by itself, is a jobber who in the long run will be a detriment and not a benefit to our business as our customer.

"Any jobber who sells our products without profit, or with such a small profit that it will not benefit him to continue permanently in the tobacco jobbing business on such a margin of profit, is not a distributor who can afford us a safe and permanent avenue of distribution, and, if by his persistent price-cutting he discourages and destroys the interest in our brands with competing jobbers, we may eventually be left without adequate means of thorough distribution in his locality.

"For this reason we are convinced that for the future of our business we are bound to prevent as far as we reasonably and lawfully may such demoralization in the trade so far as our products are concerned. This does not mean price maintenance, but it does mean that, where a jobber is not interested in making a fair and reasonable profit on our brands, and elects to sell our products, for motives of his own, at less than a living profit, we are forced to the conclusion that he is not sufficiently interested in our goods to make a desirable permanent customer, and we shall feel at liberty to remove him from our list of direct customers.

"We trust that this policy will have the approval of all customers who are concerned in making a livelihood out of the tobacco business."

That circular did not, however, differ materially from the Lorillard Company's circular, addressed to its customers a month earlier, and which read as follows:

"The 10 per cent. discount from our list price allowed all jobbers on our tobacco line is what we consider a fair and legitimate profit, accruing to the jobber for handling and distributing our goods.

"Long business usage has confirmed the fairness of this arrangement.

"Knowing that a reasonable profit is essential to the success of any business, and that only successful jobbers are satisfactory and dependable distributors, we feel that it is good business for us to urge the jobber to sell our brands at prices that will not prove an injury to our valuable trade-marks. Where the jobber persists in disregarding our policy in such matters, it is logical for us to conclude that he is willing to sacrifice our business welfare for his own selfish interest.

"We believe you will agree with us that it would be a very short-sighted policy to continue to supply such firms with the means of demoralizing our accustomed channels of distribution.

"All orders subject to acceptance by our New York office, and, if accepted, will be filled at prices ruling on day of shipment.

"No representative or employee of this company has authority to change any circular, letter, or price issued by this company."

And in August of the same year the Lorillard Company issued another circular to its customers, being Circular No. 1369, in which it set forth at length the circular above quoted and appended thereto the following statement:

"Since the issuance of this circular, other manufacturers, we are pleased to see, have

taken quite a similar action, with a view to pointing out to the jobber the importance of bringing about a betterment of selling conditions existing in different sections of the country.

"We now wish to advise that any move to better selling conditions in your section will, in so far as we can properly and lawfully assist, have our hearty support and approval."

It was evidently the policy of both companies to allow the jobbers who handled their products to understand that those who sold their products at a greater discount from their list prices than would secure to the jobbers "a fair and legitimate profit," or a "fair and reasonable profit," could not be regarded as "a desirable permanent customer," and would be regarded by the manufacturer as "willing to sacrifice our business welfare for his own selfish interest."

The American Tobacco Company bluntly told its jobbers that, if they were not interested in making a fair profit, and for motives of their own elected to sell at less than a living profit, the company would feel at liberty to remove them from the list of direct customers. The Lorillard Company made its intentions equally plain when it told its customers that "we believe you will agree with us that it would be a very short sighted policy to continue to supply such firms (those giving too great a discount) with the means of demoralizing our accustomed channels of distribution."

Because of the practice which had developed among the jobbers of selling to the retailers at a price so low as not to allow a reasonable profit, and in many cases of no profit at all, it came about that a considerable number of the jobbers, who previously had been handlers exclusively of tobacco products, added side lines such as candies, groceries, chewing gum, and other things, to their tobacco products. This was regarded by the tobacco manufacturers as a great detriment to their business, as naturally it lessened the interest the jobbers had in the tobacco products.

The result was that in certain sections of the country the tobacco jobbers were not only not making a reasonable profit, but were selling their goods at an absolute loss. This naturally caused great dissatisfaction among the jobbers, and led them to form local associations among themselves, in the hope that they might remedy what they regarded as the evil conditions in which they

were involved. The Wholesale Tobacco & Cigar Dealers' Association of Philadelphia, against which the Federal Trade Commission commenced the proceedings herein involved, was one of the associations organized for the purpose indicated.

The testimony disclosed that the tobacco market in Philadelphia had the reputation of being the greatest cut price market in the United States; that in the city of New York being perhaps equally as bad. The condition in Cincinnati, while not so bad as in Philadelphia and New York, is described as "almost as bad." The testimony shows that the condition of the tobacco business throughout the United States after the close of the World War, and especially during the years 1920 and 1921, was more "demoralized" than at any previous time. This demoralization was due to the feeling which existed among the jobbers. The tobacco manufacturing companies sold to the jobbers and they in turn sold to the retailers. The manufacturers had for a great many years given to the jobbers a trade discount of 10 per cent. and 2 per cent. for cash in 10 days.

The attitude of the American Tobacco Company is shown in a letter written by the vice president of the company under date of May 2, 1921, to a jobber who had written requesting the co-operation of the company in preventing so-called price cutting. In the reply the vice president wrote: " * * * As far as this company is concerned as Mr. Hill [the president of the company] wrote you, we are greatly interested in the matter and regret to see the tendency towards price cutting. We feel very definitely here that when jobbers have co-operated and have held such conferences as Mr. Hill has suggested then the manufacturer can step in by refusing shipments or withhold orders from the demoralizers, and thereby assist those legitimate jobbers who desire to make a profit."

And on July 8, 1921, the general sales manager of the company wrote to one of its agents "not to arrange any meetings for your jobbers. You should suggest to the jobbers that it is their duty to get together themselves. We do not want to be a part of any organization whatever, but we will insist upon the maintenance of the price that I suggested to you, as all jobbers with whom I come in contact advise me that this is the prevailing price in this community."

The examiner for the Federal Trade Commission, in his report upon the facts to the Commission, stating what the testimony dis-

closed, concluded his report as set forth in the margin. [3]

Commissioner Van Fleet, in dissenting from the order made by the Federal Trade Commission against the American Tobacco Company, said:

"The charge is that said company conspired with the Wholesale Dealers' Association to maintain prices. The association was interested in maintaining the price that its members might obtain more for their goods. The object of the American Company was not the same as the association. The American Company sold its goods upon a 10 per cent. discount to the members of the association, and its price was in no wise affected by the cutting of dealers. Of course, this did not necessarily prevent the American Company from conspiring with the association; but it is a fact to be considered whether there was such conspiracy. If dealers were cutting prices and demoralizing the trade, which at the time charged had proceeded to the extent of ruin, if continued,

the American Company had a legal right to refuse to continue business dealings with such concerns. It is evident that a concern cannot stay in business if it sells at no profit, as the evidence shows was the case here. The mere fact that the acts of the American Company were contemporaneous with those of the association is not determinative."

In the case now before us it appears that the American Tobacco Company sold its product to the jobbers outright, and without any express agreement with them as to the price at which they would sell to the retailers, or any agreement as to the price to be ultimately charged the consumers. The American Tobacco Company was convinced, however, that its business was seriously affected and endangered if certain of its jobbers in a particular locality, such as Philadelphia, for any reason undertook to sell its products at less than "a living profit." The effect of such practices occasioned great dissatisfaction on the part of other jobbers in that particular community, causing them to become

[3] Paragraph Five. The two respondent manufacturing companies manifested their interest in and co-operation with the Philadelphia Tobacco & Cigar Dealers' Association and its members by cutting off from their direct list certain jobbers whose conduct for deviating from the prices fixed by the association, in the sale of the products of the said companies, was brought to their attention. After considerable correspondence between the sales manager of the American Tobacco Company in Philadelphia and the general officers of the American Tobacco Company in New York concerning the price-cutting activities of a Camden, N. J., firm of jobbers, member of the Wholesale Tobacco & Cigar Dealers' Association of Philadelphia, on August 28, 1921, the said job—the American Tobacco Company. The said firm sold its products at a discount of 10 per cent. off list, and instead of marking on its invoices the true discount of 10 per cent. falsely marked thereon 8 and 7 per cent., respectively, which were the discounts allowed by the association. The said firm on one occasion attended a meeting of the association after having heard reports that were circulating among members of the association to the effect that they had been "breaking the price combination" While there they accused other members of the association of doing the same thing, and considerable disturbance of a physical nature was about to occur, when the meeting broke up and the said firm withdrew from the association. However, after having made proper assurances that they would desist from its so-called price cutting, the firm was reinstated on the direct buying list by the American Tobacco Company on October 4, 1921.

Paragraph Six. In the latter part of the month of January, 1921, a representative of P. Lorillard Company in the Philadelphia district had a conversation with a jobber by the name of Seider and requested him to join the Phila-

delphia Tobacco Dealers' Association—that it would be best for him. The jobber was then buying his goods from the American Tobacco Company and the P. Lorillard Company direct, and had been for many years. The said jobber had also received an invitation to attend one of the meetings of the association, and was also called upon by the president and treasurer of the association and requested to join the same. The president of the association also requested Seider's son to go along with the association prices. A representative of the American Tobacco Company also stated to Seider that it would be better for him to join the association; that he might not get his goods if he made any more disturbance. Neither Seider nor his son, who is associated with him in business, joined the association, and a month or two later his orders to the American Tobacco Company were canceled, and remained canceled for the space of two months, and his orders to the Lorillard Company were canceled and remained canceled for the space of six months. The American Tobacco Company refused to ship Seider any of its products from April 30 to July 12, 1921. Repeated requests to the said companies to fill his orders brought no replies from either. The last shipment received from the Lorillard Company was April 5, 1921, and the interim lasted until November 1, 1921. In the meantime, this old customer of Lorillard's was pleading to have his orders filled when he received the following letter from the company:

"May 2, 1921.

"Mr. George Seider, S. E. Corner 4th and Ray Sts., Philadelphia, Pa.—Dear Sir: Replying to your letter of April 30, we ask that you kindly place your orders for our products with jobbers convenient to you. * * *

"Yours very truly, Sidney Kelly, Asst. Aud."

On May 6, the Lorillard Company wrote the same jobber that they were not inclined to make

disinterested in the brands manufactured by the American Tobacco Company, and causing some of the jobbers to cease handling the products of the company. As the jobber was the channel for the delivery of the company's products to the retail trade, it did not like and sought to avoid the dissatisfaction to its jobbers in a given community by the cutting of prices below "a living profit" to its other jobbers in the same community. The testimony shows that the Lorillard Company had a like feeling towards such of its jobbers as engaged in similar practices, and that for exactly similar reasons it sought to avoid the like consequences. This is shown by the testimony of the vice president of the Lorillard Company, who was principally charged with looking after "the selling end of the business." He testified as follows:

"Q. Did the Lorillard Company seek to get its jobber customers to sell its products at such a price as would enable the jobber customers to pay their bills and to prevent the demoralization in the tobacco business?

A. They did." He further testified as follows: "Q. Do you know of your own personal knowledge of any facts showing, or tending to show, in your judgment, any dealings of any kind by the Lorillard Company or any of its officers or agents with reference to the various tobacco associations above mentioned? A. Not to my knowledge. * * * Q. Has the Lorillard Company ever had any agreement with any of its jobber customers as to resale prices of its products? A. Not to my knowledge. * * * Q. Did the P. Lorillard Company at any time, in any manner, even attempt to dictate to its customers the resale price of its goods? A. Not to my knowledge."

And then, after saying that the circulars issued by the company were made the subject of conversation with its field managers, he stated: "Q. What was the general drift of the verbal conversations? A. The men were instructed that the circular meant practically what it said, and that, if they were called upon to discuss that circular, we put

---

further shipments direct to him and suggested that he supply his "needs" through "jobbers convenient to him." October 14, 1921, the Lorillard Company, in reply to a request of Seider to be placed on the said company's direct purchasing list, said the matter had "been submitted to its sales board for its careful consideration," and that, as soon as their head salesmen covering Philadelphia submitted their recommendations as to his request (and he would doubtless receive a visit from them in the near future), the company, upon receiving their reports, would then be in a position to advise him definitely of their decision. Seider also went to see the vice president of the Lorillard Company in New York about getting reinstated. As above stated, the said jobber was reinstated on the direct buying list of the Lorillard Company November 1, 1921. This jobber firm had been a regular purchaser of the Lorillard Company from 10 to 12 years. Their credit had never been questioned. Their bills had always been paid, and only after the formation of the Philadelphia Association and his failure to join the same and abide by or follow along with the prices so fixed by it did any trouble arise between the said Lorillard Company and its said long-time customer.

The Lorillard Company was also petitioned by the subjobbers for relief from the effects of the action of the Association in placing the jobbers and the retailers in the same class as to the discounts allowed therein regardless of the amount of the purchases, and the remedy the representative of the Lorillard Company suggested was that if the subjobber interviewing him would move out of the Philadelphia district beyond the jurisdiction of the Philadelphia Association, the Lorillard Company would then sell him at prices which he had been accustomed to receive prior to the formation of the Tobacco Dealers' Association as aforesaid.

Paragraph Seven. The general policy of the

Lorillard Company was the same towards so-called price cutters in 1920 and 1921 and towards associations of tobacco dealers organized and functioning during the said years with activities similar to the respondent association regardless of state or locality. On May 20, 1921, the Lorillard Company wrote two reputed so-called price cutters in Cincinnati that "there seems to be a general movement throughout the country on the part of the jobbers, and we have recently been advised it has extended to Cincinnati, to secure a fair margin of profit for handling tobacco products" and the said respondent company requested the so-called price cutters to "co-operate with the movement on its line of merchandise." It was also part of the duty of the company's agents to report price cutters to the proper head officials occurring in the district of which the said agent had jurisdiction and frequently competitor jobbers did likewise. Under these circumstances the rule of the Lorillard Company was to write to the offending jobber and request him to cease price cutting, furnishing him with one of the circulars heretofore referred to. On August 24, 1921, a jobber reported a competitor at La Crosse, Wisconsin, for so-called price cutting, requesting that means be taken to prevent the same. The Lorillard Company replied to the complainant that they "have been working on the subject-matter of his complaint of August 24th for the past ten days and are pleased to advise that the parties referred to will, commencing this day, sell our products on a basis that will show a legitimate profit" and further stated that Wisconsin had been "slow in lining up." Operating in this way, so-called price cutters were brought back in line and from June 1 to December 31, 1921, not more than 15 or 20 so-called price cutters were dropped from the direct purchasing list of the Lorillard Company.

particular stress on two things, and, if these instructions were not followed, it was because the men totally violated them. One was that, after talking with the jobber, if this question was raised, to have it clearly understood that there was no agreement, we asked him to agree to nothing, and the other was that under no circumstances he should connive or conspire with any jobber to injure his competitor. Those two features were brought out very specifically in every interview that we had with the men."

It is not alleged, and it nowhere appears, that the American Tobacco Company entered into any agreement with other manufacturers, fixing the price at which it would sell its products to wholesalers, jobbers, or retailers. It at no time fixed the price at which retailers were to sell its products to consumers. The policy of the wholesalers and jobbers was to fix a uniform price at which they would sell to the retailers, and they agreed to allow a certain trade discount of 7 or 8 per cent., as the case might be, from the manufacturers' list prices. And what the American Tobacco Company did was to refuse to sell its products to wholesalers or jobbers who, having bought its products at a price fixed by it, thereafter sold them to the retailers at a greater trade discount than the Wholesalers' Association had agreed upon. In other words, its policy was to uphold and support the prices of its products to the retailers as fixed in a particular locality by the wholesalers or jobbers therein. The facts show that where wholesalers allowed a greater discount than that which they themselves in their association had agreed upon the business in the particular locality was demoralized and they were deprived of a fair and legitimate profit. To protect its own interests and enable the jobbers to make a reasonable profit it simply refused to sell to jobbers who sold to the retailers with a greater discount than the Wholesalers' Association had approved. We see nothing unlawful in the policy which the American Tobacco Company pursued. We cannot see that in what it did it engaged in unfair competition within the meaning of the Federal Trade Commission Act as that act has been construed by the courts.

We shall now refer to the decisions. In 1911 the Supreme Court decided Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502. It was held that a system of interlocking restrictions by which a manufacturer of proprietary medicines attempted by contracts to control, *not only the prices at which its agents could sell its products, but the prices for all sales by all dealers at wholesale or retail,* whether purchasers or subpurchasers should pay amounted to a restraint of trade, both under the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830) and at the common law. *All competition between retailers was destroyed as each was required to bind himself by contract not to sell at less than the standard price.*

In that case the court had before it express contracts which the manufacturer made with wholesalers by which the manufacturer sought to control the prices at which its products should be sold by the wholesalers, and to restrict the right of the wholesalers to sell, only permitting sales to be made to those who had been licensed to buy by the manufacturer, and who agreed not to sell below a minimum price dictated by the manufacturer. In that case Mr. Justice Hughes, writing for the court, declared: "Whatever right the manufacturer may have to project his control beyond his own sales must depend, not upon an inherent power incident to production and original ownership, but upon agreement." He then went on to point out that *an agreement in restraint of trade was illegal under the common law, unless it was found to be reasonable both with respect to the public and to the parties, and limited to what was fairly necessary in the circumstances of the particular case, for the protection of the covenantee.* "Otherwise," said the court, "restraints of trade are void as against public policy." It was observed that the agreements before the court were designed to maintain prices, "after the complainant has parted with the title to the articles, and to prevent competition among those who trade in them."

Again it was said: "If there be an advantage to a manufacturer in the maintenance of fixed retail prices, the question remains whether it is one which he is entitled to secure by agreements restricting the freedom of trade on the part of dealers who own what they sell. As to this, the complainant can fare no better with its plan of identical contracts than could the dealers themselves if they formed a combination and endeavored to establish the same restrictions, and thus to achieve the same result, by agreement with each other. If the immediate advantage they would thus obtain would not be sufficient to sustain such a direct agreement, the asserted ulterior benefit to the complainant cannot be regarded as sufficient to support its system. But agreements or combinations be-

tween dealers, having for their sole purpose the destruction of competition and the fixing of prices, are injurious to the public interest and void. They are not saved by the advantages which the participants expect to derive from the enhanced price to the consumer."

The court further said: "The complainant having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic."

The facts of that case are clearly distinguishable from the facts in this. In that case the attempt was to control the prices charged by retailers to consumers, and to prevent wholesalers from selling to retailers who sold the goods below the minimum price fixed by the manufacturer. In this case the most that can be claimed is that the company has sought to maintain a uniform price on its products until they reach the hands of the retailers. The retailers are free to sell to consumers at any price they see fit. It does not appear that the American Tobacco Company has concerned itself with the prices at which its goods are sold by retailers to consumers.

In 1911 the Supreme Court also decided Standard Oil Co. of New Jersey v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, in which it announced, through Chief Justice White, that the Sherman Act should be construed in the light of reason, and so construed that it prohibited all contracts and combinations which amount to an unreasonable or undue restraint of trade in interstate commerce. So construed, the court held the Standard Oil Company, as it then existed, constituted an unreasonable and undue restraint of trade. A few weeks later the court decided United States v. American Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663, in which it reaffirmed the rule announced in the Standard Oil Case, and declared that the American Tobacco Company was a combination in restraint of trade, and an attempt to monopolize the tobacco business in interstate commerce, within the prohibitions of the Sherman Act. The dissolution of the American Tobacco Company was decreed, and the court below was directed to work out a plan for the recreation of the company in harmony with law.

In the proceeding now before the court, the American Tobacco Company is not charged with being a combination in restraint of trade, and therefore illegally existing, but it is charged with carrying on its business in a manner which constitutes "unfair methods of competition," under the Federal Trade Commission Act of September 26, 1914, 38 Stat. p. 717, c. 311. Neither the Standard Oil Case nor the American Tobacco Case have therefore any application to the facts herein involved. There is nothing in the record to show that in the present case the American Tobacco Company is seeking to monopolize commerce in tobacco by entering into agreements with other manufacturers of tobacco products or with tobacco growers.

In 1919 the Supreme Court decided United States v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443. The court declared that the purpose of the Sherman Act was to preserve the right of freedom to trade. "In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long-recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell." The court has had occasion in a number of subsequent cases to point out that this case has been misunderstood by the profession, and it has explained, if not what the case means, what it does not mean.

It is enough for the present purpose to say that there is nothing in that decision to sustain the action taken by the Federal Trade Commission in the case now before the court. There is nothing in the record that we can find that indicates any purpose "to create or maintain a monopoly." That its business is an entirely private business will be conceded. Whether it has improperly exercised its own independent discretion as to the parties with whom it will deal, and so been guilty of "unfair competition," within the meaning of the Federal Trade Commission Act, is a question we must determine.

In 1920 the court decided Federal Trade Commission v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993, in which it affirmed the decision of this court in 258 F. 314, 169 C. C. A. 330, 11 A. L. R. 793, which reversed an order made by the Commission. The facts relied upon as showing unfair competition were that the respondents, for more than a year, had refused to sell steel ties, manufactured by another concern and which were used to wrap bales of cotton, unless the prospective purchaser would also buy from them the bagging to be used with the number of

ties proposed to be bought. This the court declared did not constitute unfair competition.

In considering the meaning of the words "unfair method of competition" the court held they "are clearly inapplicable to practices never heretofore regarded as opposed to good morals, because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create a monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade."

The pertinency of the Gratz Case to the case now before the court lies in the fact that we have been unable to discern in this record that what the American Tobacco Company has done constitutes practices which have heretofore been regarded "as opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy, because of their dangerous tendency unduly to hinder competition or create a monopoly."

In 1921 the court decided Frey & Son, Inc., v. Cudahy Packing Co., 256 U. S. 208, 41 S. Ct. 451, 65 L. Ed. 892. The action was brought under the Sherman Act to recover triple damages, on the ground that defendant was engaged in a combination in restraint of trade. The facts, as they were stated in the opinion of the Circuit Court of Appeals for the Fourth Circuit in Cudahy Packing Co. v. Frey & Son, Inc., 261 F. 66, are as follows:

"The defendant manufactured and sold 'Old Dutch Cleanser,' and developed a large trade in that article by extensive advertisements in newspapers and magazines. * * * Considering the maintenance of a fixed price necessary to an adequate profit, defendant adopted the following means of promoting sales and maintaining the wholesale price: It sold only to jobbers and wholesalers who were expected to sell only to retailers. Soliciting agents were sent to retail merchants, and orders taken from them at the list price, to be transmitted to any jobber that the retailer named of the jobbers to whom the defendant was selling. These jobbers selected by defendant, though called distributing agents, were purchasers to whom defendant sold at a fixed deduction or discount from the list price. This discount was intended as the jobber's profit. By circulars and personal interviews jobbers were insistently exhorted to maintain the fixed prices."

The trial court charged: ' "I can only say

to you that if you shall find that the defendant indicated a sales plan to the wholesalers and jobbers, which plan fixed the price below which the wholesalers and jobbers were not to sell to retailers, and you find defendant called this particular feature of this plan to their attention on very many different occasions, and you find the great majority of them not only expressing no dissent from such plan, but actually co-operating in carrying it out by themselves selling at the prices named, you may reasonably find from such fact that there was an agreement or combination forbidden by the Sherman Anti-Trust Act."

The Supreme Court held the instruction was erroneous, and that the recited facts, standing alone, did not suffice to establish an agreement or combination forbidden by the Sherman Act. The Federal Trade Commission Act was not involved, and the question of unfair competition was not before the court. The question was whether the facts disclosed a combination in restraint of trade.

In 1923 the court decided Federal Trade Commission v. Sinclair Refining Co., 261 U. S. 463, 43 S. Ct. 450, 67 L. Ed. 746, and affirmed the judgments of the courts below, reversing in four cases the orders entered by the Federal Trade Commission. The practice complained of was that a manufacturer of gasoline leased underground tanks with pumps to retail dealers at nominal rentals and upon condition that the equipment was to be used with gasoline supplied by the lessor. This, it was held, did not constitute unfair competition within the Federal Trade Commission Act. The case sheds no particular light upon the question herein involved, except that it is important, because the court again took occasion to say that the practice was not opposed to good morals, because characterized by deception, bad faith, fraud, or oppression, and cited the Gratz Case. And the court said: "The powers of the Commission are limited by the statutes. It has no general authority to compel competitors to a common level, to interfere with ordinary business methods or to prescribe arbitrary standards for those engaged in the conflict for advantage called competition." It added that: "It is essential that those who adventure their time, skill and capital should have large freedom of action in the conduct of their own affairs."

In the year 1922 the court decided Federal Trade Commission v. Beech-Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882. This case had to do

with an attempt on the part of the manufacturer to compel the purchasers of its products to agree to maintain and keep standard resale prices fixed and determined by the company. The company made it known to jobbers, wholesalers, and retailers that it insisted that they should sell its products at the resale prices fixed by it, and refused to sell to any not maintaining such prices. It not only refused to sell to its customers who failed to maintain such prices but it refused to sell to others who sold to those who did not maintain such prices. In its opinion in this case, after referring to some of the prior cases the court said: "By these decisions it is settled that in prosecutions under the Sherman Act a trader is not guilty of violating its terms who simply refuses to sell to others, and he may withhold his goods from those who will not sell them at the prices which he fixes for their resale. He may not, consistnently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade."

The question in the case arose under the Federal Trade Commission Act, which declares unlawful "unfair methods of competition." The court reasserted what was said in the Gratz Case as to the meaning of the words "unfair methods of competition." It then considered the facts disclosed by the record, saying: "From this course of conduct a court may infer, indeed cannot escape the conclusion, that competition among retail distributors is practically suppressed; for all who would deal in the company's products are constrained to sell at the suggested prices. Jobbers and wholesale dealers who would supply the trade may not get the goods of the company, if they sell to those who do not observe the prices indicated or who are on the company's list of undesirables, until they are restored to favor by satisfactory assurances of future compliance with the company's schedules of resale prices. Nor is the inference overcome by the conclusion stated in the commission's findings that the merchandising conduct of the company does not constitute a contract or contracts whereby resale prices are fixed, maintained, or enforced. The specific facts found show suppression of the freedom of competition by methods in which the company secures the co-operation of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose. By these methods the company, although selling its products at prices satisfactory to it is enabled to prevent competition in their subsequent disposition by preventing all who do not sell at resale prices fixed by it from obtaining its goods. Under the facts established, we have no doubt of the authority and power of the Commission to order a discontinuance of practices in trading, such as are embodied in the system of the Beech-Nut Company."

Justices Holmes, McKenna, McReynolds, and Brandeis dissented. Justice Holmes said: "The ground on which the respondent is held guilty is that its conduct has a dangerous tendency unduly to hinder competition or to create monopoly. It is enough to say that this I cannot understand. So far as the Sherman Act is concerned I had supposed that its policy was aimed against attempts to create a monopoly in the doers of the condemned act or to hinder competition with them. Of course there can be nothing of that sort here. The respondent already has the monopoly of its own goods with the full assent of the law and no one can compete with it with regard to those goods, which are the only ones concerned."

Justices McKenna and Brandeis concurred in the opinion of Justice Holmes.

Justice McReynolds filed a separate dissent, in the course of which he said: "There is no question of monopoly. Acting alone, respondent certainly had the clear right freely to select its customers—to refuse to deal when and as it saw fit—and to announce that future sales would be limited to those whose conduct met with its approval."

The Beech-Nut Case differs radically from the instant case, in which, as before remarked, no attempt is made by the American Tobacco Company to compel retail dealers in its products to maintain a price fixed by it in a resale to consumers.

In 1924 the court decided Federal Trade Commission v. Raymond Bros. Clark Co., 263 U. S. 565, 44 S. Ct. 162, 68 L. Ed. 448, 30 A. L. R. 1114. It affirmed the order of the lower courts, which vacated and set aside an order of the Federal Trade Commission. The Supreme Court reasserted the long-recognized right of a trader, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. The Raymond Company declined to do business with the Snider Company unless that company discontinued its business with a certain other company engaged in a similar business. This it was claimed unduly hindered competition in trade and amounted to "unfair competition." The court held that a wholesaler has a right

to stop dealing with a manufacturer "for reasons sufficient to himself." It was pointed out that a different case would have been presented if the Raymond Company "had combined and agreed with other wholesale dealers that none would trade with any manufacturer who sold to other wholesale dealers competing with themselves, or to retail dealers competing with their customers."

[6, 7] The question here is not whether what has been done by the American Tobacco Company constituted a restraint of interstate commerce contrary to the Sherman Law, and therefore unlawful. The Federal Trade Commission is not clothed with jurisdiction to hear and determine that question in this proceeding, although clothed with a limited jurisdiction as respects alleged violations of Anti-Trust Acts. Sections 6–10 of the Federal Trade Commission Act. Its authority to make the order which it entered herein is restricted to matters of "unfair competition." The Commission is not a court, and only exercises administrative power within the provisions of the statute. See our opinion in Eastman Kodak Co. v. Federal Trade Commission, 7 F. (2d) 994, recently decided.

[8] The examination of the testimony convinces us that what the American Tobacco Company is shown to have done is so far removed from constituting an unfair method of trade that it actually tended to promote fairness of trade and the suppression of unfairness in competition. Practices cannot be regarded as fair which work the demoralization of the business, and practices cannot be regarded as unfair methods of competition if a manufacturer declines to sell to wholesalers who demoralize the legitimate market by selling at a price which those in the business regard as insufficient to enable the business to be conducted with reasonable profit. The American Tobacco Company was in our opinion within its rights in declaring that it would not sell to jobbers who made it a practice to sell to retailers at a price which made it impossible for the jobbers to carry on their business at a reasonable profit and worked the demoralization of the trade. In holding that the Federal Trade Commission Act was intended to prevent what the American Tobacco Company did we are clearly of opinion that the Commission has misapprehended the intent of the act.

In an earlier part of this opinion attention was called to the dissent filed by Commissioner Van Fleet, and to his statement therein that in his opinion the American Tobacco Company had a legal right to refuse to do business with wholesalers or jobbers who were cutting prices to retailers, and thereby "demoralizing the trade, which at the time charged had proceeded to the extent of ruin if continued." In that opinion we fully concur, unless the American Tobacco Company had entered into a combination or conspiracy with the Wholesale Dealers' Association and the other defendants named to maintain certain prices agreed upon between them. He did not think the evidence before the Federal Trade Commission was sufficient to establish such a conspiracy. In his dissent, referring to this phase of the matter, he said:

"Of course, conspiracy is often incapable of direct proof; but when resort is had to circumstantial evidence, as in this case, the proof should rise above the dignity of mere suspicion. Some of the evidence relied upon to sustain the order hardly ever rises to that dignity. Without summarizing the evidence, to my mind it appears that the truth is that the American Company had nothing to do with the organization of, nor conduct of, the association, and I know of no proof to the contrary. Also I believe its acts were taken independently of the association, and no real proof to the contrary appears. The Commission dismissed the case against the Lorillard Company for lack of proof, and I believe that, eliminating evidence of acts of others for which the American Company was in no wise responsible, and discarding mere conjecture, there is not proof to warrant an order against the American Company."

It must suffice now to say that we are entirely in accord with the conclusion at which he arrived, and we are of opinion that there is no proof which warrants the order which the Commission entered.

Judge HAND concurs in the result, on the ground that by the dissolution of the association the controversy became moot.

The order is set aside, in so far as it affects the American Tobacco Company, the sole petitioner.